2022 IL App (2d) 210660-U
No. 2-21-0660
Order filed April 11, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* K.M. and R.M., Minors | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | Nos. 17-JA-116 |
| | ) | 17-JA-117 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. Mark M., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's fitness and best-interest findings were not contrary to the manifest weight of the evidence. Affirmed.

¶ 2   Respondent, Mark M., appeals from the trial court's orders finding him unfit to parent his children, K.M. and R.M., and terminating his parental rights. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4   On April 19, 2017, the State filed an 11-count amended neglect petition concerning K.M. (born April 1, 2013), and a 10-count neglect petition concerning R.M. (born December 9, 2014). The petitions were identical in that one of the counts alleged that respondent had reported that he

did not want to care for the children. The others alleged that the parents were not providing proper care and their environment was generally injurious. More specifically, the State alleged that the mother, Susan M., had domestic-violence, substance-abuse, and mental-health issues, had overdosed in their presence, and was suicidal. The eleventh count in R.M.'s petition alleged that the environment was injurious to her welfare because Susan had stomped on an older sibling's, C.S.'s, chest and abdomen and grabbed him by the neck.[1]

¶ 5     An April 18, 2017, statement of facts provided by the Department of Children and Family Services (DCFS) explained that, due to a safety plan put in place as a result of another pending DCFS investigation, C.S.'s maternal uncle, Stephen K., was present in the home on April 15, 2017, when Susan harmed C.S. Susan was ultimately arrested for domestic violence, and the children were left in Stephen's care. The statement of facts reported that, when arresting Susan, the sheriff's office contacted respondent, who "refused to return home to assist Stephen," and that he did not return home until April 17, 2017, two days after Susan was arrested. Respondent was unable to establish an appropriate care plan for the children and, so, DCFS took them into protective custody. The statement of facts also reported that, a few days prior to this incident (on April 14, 2017), DCFS had met with respondent and Susan. Susan communicated that she no longer wanted to care for the children and wished for respondent to assume all parenting responsibilities. Respondent had explained that he could not care for the children full time, due to his employment with United Parcel Service (UPS). The caseworker prepared a new safety plan such that Stephen would live in the home over the weekend, and the plan would be revisited the next Monday. Thus,

---

[1] C.S. has a different father and is not at issue in this case. Further, Susan ultimately consented to adoption and is not a party to this appeal.

respondent had reported to DCFS *before* the April 15, 2017, weekend, that he would be working and could not care for the children that weekend, which partly prompted the safety plan arrangement of the children being supervised by Stephen and respondent's sister. Further, it appears that respondent was living with a girlfriend or moving out of the home he shared with Susan when the incident happened.

¶ 6    Finally, the statement of facts also included descriptions of other incidents of endangerment, including incidents wherein respondent had obtained orders of protection against Susan due to her suicidal behavior and threats to harm the children. In addition, according to the statement, C.S. had reported that there were times when respondent had grabbed him and held him down in a headlock and that Susan and respondent had engaged in domestic violence in the children's presence. The statement of facts further reported,

> "Despite [respondent's] knowledge that Susan was no longer interested in parenting the children, he continued to press Susan to be the children's primary caretaker. On several occasions, DCFS has attempted to make safety plan arrangements with [respondent] in an attempt to keep his children safe. [Respondent] would often want the responsibility placed on Susan despite his knowledge of her mental health issues and prior indicated reports with the Department. [Respondent] stated that he would prefer that the children be taken care of by Susan for at least one month while he 'gets things together.' [Respondent] has not taken a strong interest in caring for his children full-time, and has been unable to provide adequate care plans for the children while he is working."

The report concluded with a list of 25 occasions wherein the Machesney Park police department had contact with the family.

¶ 7   On April 19, 2017, respondent waived a shelter care hearing.  A report prepared on September 20, 2017, by Children's Home & Aid, explained that respondent completed an integrated assessment screening on May 23, 2017.  As a result, it was recommended that he complete the following services: "[c]omply with Children's Home and Aid recommendations, individual counseling, parenting classes, domestic violence services, and mental health services." The same report also noted that K.M. displayed very serious behavioral problems, was psychiatrically hospitalized, and the foster parent explained that the behavior intensified after visiting with Susan once per week; thus, it was recommended that visitation between K.M. and Susan be suspended until K.M. stabilized, learned coping skills, and until it was clinically appropriate to resume.  Apparently, K.M.'s visitation with respondent was suspended at the same time and for the same reasons.  On October 23, 2017, the court adjudicated the children abused and neglected.

¶ 8   According to service plans in the record, respondent informed the caseworker that, due to his busy work schedule, he wished to work on one service requirement at a time and wanted to start therapy so that the children could return home to him.  The caseworker explained that she had not received the consents necessary to refer respondent to individual counseling and, further, that her understanding was that respondent had informed a prior caseworker that he was unsure if he wished for the children to return home to him and that he had not previously expressed that he wished to be in a primary caregiving role.  The caseworker told respondent to let her know if his position had changed, but, to date, he had not expressed that desire.

¶ 9   At a permanency review hearing on April 24, 2018, the court found that respondent had not made reasonable efforts but made no finding regarding progress.

¶ 10    At a September 25, 2018, permanency review hearing, it was reported that respondent had completed parenting classes, was consistent with visitation, and had begun individual and domestic violence counseling.  The State noted, however, that respondent was not regularly cooperating or communicating with the agency, or his responses were extremely delayed.  According to the State, time management and responsiveness was relevant to any question of returning the children home, since both required many services and doctor's appointments for their needs and required guardians who had the time and skills to manage their schedules and keep appointments.  The court deferred findings as to respondent.

¶ 11    At the next hearing, on March 12, 2019, the court found that respondent had "barely" made reasonable efforts and that he had not made reasonable progress.  The court found, "Father has some work to do.  He really needs to invest himself in his punctuality.  It's very important for the children.  It's very important for his services."

¶ 12    At review hearings on August 13, 2019, and January 27, 2020, the court found that respondent did not make reasonable efforts or progress.  At the January hearing, it was noted that respondent had been discharged from a partner abuse program three times.  Then, when he was approximately 24 weeks into the program, respondent attended a domestic violence session with a black eye, explaining that he had a physical altercation with a woman at a laundromat.  As a result, his domestic violence classes were being extended.  The State asserted that respondent "continues to engage in relationships with people that have violent domestic violence issues" and, further, that he has been the subject of an "*ex parte* plenary" order of protection by an unidentified woman.  According to the guardian *ad litem* (GAL), respondent did not inform DCFS about that order and he had not acknowledged its relevance.  Finally, the State asserted that, although

respondent had been attending visits for two years, they were not going well, lasted one hour, remained supervised, and the case aide sometimes needed to assist and redirect R.M.

¶ 13    On June 25, 2020, the parties represented to the court that they agreed to a reasonable-efforts finding, but that the court should defer a finding on progress, due to interruptions in services on account of the Covid-19 pandemic.  In December 2020, the GAL indicated she wanted a goal change, and respondent requested an evidentiary hearing.  Accordingly, the court made no findings and set the hearing for February 2, 2021.

¶ 14    At the February hearing, the GAL reiterated that she was requesting a goal change. Respondent's counselor, Dina Lauman, from Family Counseling Services, testified that she began counseling him on October 7, 2020.  She testified that his attendance was excellent, he had made progress, had internalized what he was learning, his attitude was "really good," and he wanted to do whatever he could to have the children returned to him.  She reviewed reports from his prior counselors and noted that he was already making progress with them and that he independently sought out self-improvement books and podcasts.  Lauman mentioned that respondent wished to see K.M., and she, too, was confused as to why respondent was not allowed visitation with K.M., when the child's regressive behaviors seemed to be triggered by visiting Susan.  She tried to arrange a second meeting with caseworker Heather Rutenber, since she was unable to discuss certain matters in an initial Zoom meeting with the agency, but the meeting did not take place. Lauman agreed that respondent informed her that there was an incident on December 4, 2020, where he drove to the home of a former girlfriend, who had two small children, and was banging on the door and the police were called.  He had been charged with phone harassment and disorderly conduct (the court took judicial notice of the case number but noted that there was no conviction and that defendant still had the right to defend himself in that case).  Lauman opined that the

behavior was an aberration. In response to questioning by the GAL, Lauman explained that respondent remained unclear about the reason that the children were removed from him, and she agreed with the GAL that "there still needs to be progress made and him understanding the part that he played and why the children have been removed." Lauman discussed with respondent his visits with R.M., but when the GAL asked if they discussed that respondent would threaten certain discipline in visits and then not follow through or that he threatened R.M. that, if he did not behave, respondent would stop the visits, she agreed they did not discuss those details. Nevertheless, Lauman noted that respondent only had one hour per week with his son and wanted to make the best of that hour; further, he had completed parenting classes and seemed willing to take them again, if deemed necessary. Respondent's exhibits Nos. 1 through 5, reports of respondent's counseling sessions with Lauman, were admitted without objection.

¶ 15    Next, Liam Timoti, a case aide who had supervised visits between respondent and R.M. since July 2020, testified that respondent was consistent and appropriate in his visits and wished to see R.M. every week. He agreed that there was sometimes a lack of discipline during visits and that R.M. required verbal prompts to stop hitting respondent, Timoti, or the caseworker. Although respondent used verbal prompts to redirect R.M., they were not always effective and respondent did not always follow through with consequences. Sometimes respondent would pick up R.M. when he was engaged in unsafe behavior; respondent almost always struggled to get R.M. into Timoti's car at the end of visitation. Timoti testified that respondent brought appropriate toys to visits. The GAL asked Timoti to estimate in how many of the weekly visits R.M. misbehaved, and he estimated 90% of the time. He did not notice any real improvement in how respondent handled the behavior. Respondent never gave R.M. a "time out."

¶ 16    The court took judicial notice of the reports from the review period. In argument, the GAL noted that the reports reflected the caseworker tried to communicate with respondent, but he did not cooperate. The foster parents provided suggestions on ways to help R.M. in terms of discipline as well as activities he might enjoy, but respondent ignored those suggestions, and Timoti had not witnessed any improvement in respondent's ability to discipline R.M. In addition, the GAL noted that respondent had recent criminal charges, was not internalizing what he was learning in counseling or self-help books, and still did not clearly understand why the children were removed from his care. She explained that the basis of the removal of the children from respondent was that he was not able to provide an adequate care plan for the children. When the police called and asked him to come home to help take care of the kids, "he refused. He was supposed to be supervising mother's visits between the children, and he didn't do it, um, and allowed mom to be around the children unsupervised." She continued that respondent had been unable to properly parent his children or provide a proper care plan for them. The GAL concluded that the case was opened in 2017 and they were still at "ground zero." There simply was not sufficient progress, and the children deserved permanency.

¶ 17    The court took the matter under advisement. On March 3, 2021, it found that respondent made reasonable efforts but not progress and changed the goal to substitute care pending termination of parental rights. The court noted that almost 40 months had passed since the children were adjudicated neglected. Although efforts were expended over those 40 months, respondent had not "internalized the fruits of those efforts." The court changed the goal and commented that it was "not optimistic about the future." The court also noted that, due to a lack of evidence, it did *not* consider the order of protection the State alleged had been entered against respondent.

¶ 18    On April 26, 2021, the State petitioned to terminate respondent's parental rights, asserting that he was unfit because he failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) make reasonable efforts toward the return of the children to him during a nine-month period after the adjudication of neglect, specifically, for the periods March 12, 2019, to December 11, 2019, and April 28, 2019, to January 27, 2020 (*id.* § 1(D)(m)(i)); and (3) make reasonable progress toward the return of the children to him during a nine-month period after an adjudication of neglect, specifically, for the periods March 12, 2019, to December 11, 2019, and April 28, 2019, to January 27, 2020 (*id.* §1(D)(m)(ii)).

¶ 19                                  A. Fitness Hearing

¶ 20    On May 14, 2021, the fitness hearing commenced. Heather Rutenber testified that she has been a caseworker for 27 years and has been with Children's Home & Aid for 5 years. Rutenber explained that she was assigned to the case in January 2020. She noted that the case came into care because there had been domestic violence between respondent and Susan, Susan became suicidal, and ultimately, due to his employment, respondent was unable or unwilling to care for the children. At the time of the hearing, K.M. was age eight and R.M. was age six. Both require specialized care and consistent and constant supervision. They both have IEPs and require medication management and counseling. The children have been in the same foster home since 2018.

¶ 21    Rutenber testified that, as a result of his integrated assessment, respondent was recommended for individual counseling, parenting classes, domestic violence counseling, as well as visitation and cooperation with the agency. He did not attend all family and caseworker team quarterly meetings, sometimes missing due to work, oversleeping, or forgetting the date. For two

months when the case first opened, respondent did not engage in initial visits with his children. Although respondent initially communicated with his caseworker, starting in 2019, it became more difficult to communicate with him. She described his communication as "poor" and noted challenges she had experienced emailing and texting respondent with no answer. She related that, on one occasion, she had to contact a third party to verify that respondent had received her text message. According to Rutenber, late in the case (after the goal changed), respondent explained that there was no point in contacting her, that he was being bullied and set up, and that there was no reason to contact Children's Home & Aid. Rutenber noted that, before Lauman, respondent was counseled by other counselors, including Bridget Reddy for around 18 months from 2019 to mid-2020.

¶ 22 With respect to K.M., Rutenber explained that there had been some therapeutic visits with respondent, Susan, and K.M., but afterward, K.M. regressed and exhibited concerning behavior. In August 2019, the therapist determined that visitation between K.M. and both parents needed to be suspended. Rutenber testified that, on six to eight occasions, clinical staff continued to assess K.M. as too fragile to resume visitation with respondent and concluded it was not in K.M.'s best interest, given her emotional reactions after the visits. Rutenber explained that she, along with other caseworkers, discussed this with respondent "numerous times," the most recent occasion being in early April 2021. "This has been an ongoing conversation with [respondent] since 2019." She stated that respondent was well aware of why he was not having visitation with K.M., appeared to understand, and did not ask questions about how to facilitate future visitation. She noted that she explained the reasons to Lauman during their November 2020 meeting, and that she communicated with Lauman monthly via email. When asked on cross-examination if the visits with K.M. were suspended due to K.M.'s problems with Susan, Rutenber responded that "[i]t was

based on [K.M.]'s emotional reactions to both parents. [K.M.] was more verbally outspoken regarding issues with her mom, but it was [*sic*] both parents were present for those visits."

¶ 23 Rutenber agreed that in an August 13, 2019, report from counselor Reddy, she reported that respondent was working many hours, attending his counseling, and that she was concerned that he was not getting much sleep. Reddy also wrote that respondent loved his visits and planned crafts and activities ahead of time, and that he wanted to work things out and be in his children's lives long term. The report reflected that they planned to continue to work on other issues, such as respondent's anger. Reddy left her position in August 2019, and respondent started counseling with Lauman. Rutenber agreed that respondent consistently attended counseling.

¶ 24 According to Rutenber, respondent's domestic violence program was a 24-week program. He took it four times before completing it. She did not characterize his completion as successful, because, in October 2020, shortly before the program was to end, he was involved in an incident with a woman at a laundromat that could have resulted in police contact. The facilitators were concerned that, although respondent could verbalize what he needed to do, he could not behave in a manner deemed safe and appropriate. He did not fully share what happened at the laundromat, and there was concern that, if he was implementing the skills, he might not have been involved in the incident. As such, although he completed the program, there were recommendations for continued counseling to address the domestic violence. It was Rutenber's understanding that the incident or dispute occurred because respondent instigated it. She also testified that police were called in July or December 2020, due to respondent's argument with another woman, but the investigation returned unfounded.

¶ 25 Rutenber testified that she remained concerned about respondent's ability to safely parent, given his inability to discipline and control R.M. at visits. She explained that R.M. had run around

the first floor of the building, out into the street, laid down in the parking lot, and that respondent would blame R.M. and suggest that, if he did not behave, the visit would end. When asked to list behaviors for which respondent would "blame" R.M. and say "why are you doing this," Rutenber described "[h]itting, kicking, punching, running out of the room, throwing items at [respondent], hitting him with a lunch box, hiding, [and] climbing on tables." When R.M. ran around, respondent chased him, and R.M. thought it was a game. The case aide would intervene. Rutenber testified that she and the case aide had conversations with respondent and attended visits to model methods for handling R.M. However, respondent did not initiate those techniques or others taught in parenting classes. He did not follow through on threats of discipline or time-outs. Respondent did not move to unsupervised visitation as a level of safety needed continual monitoring. She conceded that, to attempt to connect with and entertain R.M. during their one-hour visits, respondent brought a bag of games to visits.

¶ 26    Lauman testified consistently with her testimony from the permanency review hearing. In addition, she emphasized the progress she saw respondent making and his use of skills taught by prior counselors for managing emotions and anxiety. Lauman agreed that respondent had not shared with her some of the behaviors R.M. exhibited at visits or his attempts to manage them. She remained unclear on why respondent could not visit K.M., when it seemed that the mother triggered K.M.'s behavior. Lauman testified that respondent deeply loves his children.

¶ 27    Respondent testified that he is 41 years old. He has been a package handler for the Rockford UPS for 23 years. When the children first came into care through the hearing date, he worked primarily second shift (starting between 1 and 4 p.m. and ending between 8 and 10 p.m.) and third shift (starting between 9 and 11 p.m. and ending between 2 to 4:30 a.m.). He has a "blended" full-time job and sometimes works both shifts. He disagreed with Rutenber's

characterization of his communication, noting that many communications from her were received while he was working.

¶ 28    Initially, in March through July 2019, his visitations with R.M. were at a discovery center with activity stations and a playground. He noticed that R.M. had an "exceptionally high energy level." The center had options to move from various activities when R.M. wanted to do something else. Also, respondent brought a "plan B" bag with different games and snacks. Respondent's hour with R.M. sometimes also overlapped with a second hour in which respondent and Susan were both present, which also helped when R.M. wanted to move to another activity. He could go between the two parents and do different tasks. Starting around August 2019, however, respondent testified that Susan was offered an opportunity for therapeutic visits at the Children's Home facility, so respondent's visitation with R.M. moved there too. He understood that the same case aide was responsible for both back-to-back visits, and his visit was moved to accommodate the case aide. Respondent felt that the visits in a business office were like having a child in a jail or cage; the visits took place in "a small four-walled room, would have either one table or once in a while we would get to get a bigger room with more tables. But it was very vanilla, very plain, not much options there, other than my activity bag that I brought so that we had something to do." The room was around 15 feet by 15 feet. Respondent stated that he immediately expressed concerns about the location. "My son needs a little bit more activity than just sitting at a desk or table or just sitting on a floor and being quiet and calm because you are in a business setting and you can't bother anybody else in another room." He continued,

>   "He was very reluctant and did not like staying in the room very much. He liked to
>
>   try to dart out. We had to be proactive to kind of monitor the door area. And at the very
>
>   beginning I had plenty of activities and that, but the room setting I think kind of wore on

him like it wore on me. It just, same four walls, very boring environment. And then as COVID came into play later, where not being able to bring but one or two games and no food, no snacks, really took an emotional toll and mental toll on us."

¶ 29   Respondent agreed that there were a few occasions when R.M. ran out of the room, but it was not often, and they managed it by laying out the room so he was near a chair with someone by the door. He believed they tried to make the best out of the situation.

¶ 30   Respondent said he had a few visits with K.M. but then they abruptly ended. He was not offered therapeutic visits with her and, when they were offered to Susan, he asked for one. Respondent testified that Rutenber responded that she was not allowed to disclose or discuss someone else's case.

¶ 31   He provided each of his counselors with the case management plan so that they could help him work and improve, identify objectives, and make progress to be with his children outside of the system. He explained that his first two counselors "were not the best," and they seemed to not communicate well or connect with the same final goal. In contrast, Lauman agreed to set up a meeting with the caseworker and to try to identify how to "actually achieve what they're asking me to do and actually get that progress, to demonstrate it." The meeting took place in October 2020. The meeting started well, but it turned into him being told that he was not doing what he is supposed to do, without concrete suggestions offered, and it became heated, sidetracked, and did not go well.

¶ 32   Respondent completed parenting classes. He performed all drug and alcohol drops, and all were negative. He testified that he communicated clearly through the process that his goal was to have his children returned to him. Respondent attended the domestic violence program and received a certificate stating that he achieved "completion with concerns." As for the laundromat

incident, which occurred in early 2020, he explained that he was there with a woman he had been out with a few times and another man started texting her. He commented that she should be transparent and that he did not intend to be a third wheel. She told him to mind his own business and punched him. He then left the laundromat. Respondent said he discussed it with the domestic violence counselor and noted that, as taught, he removed himself from the situation so that the incident would not escalate, but he was informed that he was exercising "male privilege."

¶ 33 He agreed that, at some point during the domestic violence counseling, an ex-girlfriend obtained an order of protection against him and that there were criminal charges pending. Respondent agreed he had two children with the ex-girlfriend, but he had not told his caseworkers because he did not, at first, know that the children were his. Respondent disagreed that he refused to take K.M. and R.M. so as to avoid them going into care. He said he was not informed until Sunday of that weekend that Susan was arrested, and, by then, a meeting was already scheduled for Monday:

> "I conveyed from the very beginning that I needed help with child care because I can't take care of kids with no income. And if I don't go to work, I will lose my job. There was nobody there to cover for me. The job I had, I'm the only person. *** I had asked for help. *** As a matter of fact, her brother was there at the house to, you know, watch the kids. I had him helping watch them. And they took them from him while we were there. So that information is not accurate."

¶ 34 On September 2, 2021, the court found respondent unfit on the three bases alleged in the State's petition. The court noted that the case had been pending for more than three years (39 months) since disposition. Although respondent made efforts over the course of the 39 months, the court had previously found that he did not make reasonable efforts or progress during the

specific two nine-month periods alleged in the State's petition and that the court could consider evidence of progress only from those two periods. The court stated that it had reviewed the two service plans that governed those periods, and they revealed that, although he attended counseling, he was not making progress in parenting specialized children. Further, during the relevant period, in August 2019, respondent was discharged from domestic violence counseling and, while he did re-enroll and ultimately complete it, there was great concern that over his ability to assimilate the information he was provided. The relevant plans also reflected that several visits were missed during the period. The court noted that the State met its burden by clear and convincing evidence and that the "service plans supplement the orders entered in the aforementioned permanency reviews and allow the court to find by clear and convincing evidence that father has not made reasonable efforts or progress during those two very specific nine-month periods." The court noted that "for the same reasons" the State met its burden that respondent failed to "maintain a reasonable degree of interest, concern, or responsibility, and that—that should not be taken to mean that he is unconcerned about the welfare of his children. That's not what the statute intends to be meant but rather measures his ability to essentially gain the parenting skills necessary to—to regain fitness."

¶ 35                                      B. Best-Interests Hearing

¶ 36    On October 5, 2021, the case proceeded to a best-interests hearing. The State again called Rutenber. She testified that the children have been together in the same foster home since 2018. Rutenber has observed them in the home numerous times. There are eight people in the home: the foster parents, K.M. and R.M., and four other children (biological and adopted). Both K.M. and R.M. have special needs and have IEPs, and the foster mother, primarily, ensures that they attend the counseling, medical appointments, and services that they need, although the parents work together as a team. The foster parents provide daily food, clothing, and shelter, although she

acknowledged that at visits, respondent had provided gifts, toys, clothing, and food. Respondent had not been involved in the children's ongoing doctor's visits or counseling appointments. Respondent had not seen K.M. since 2019, on account of her disassociation and psychiatric treatment required after the visit she had with respondent and Susan, and he had not seen R.M. since late 2020. The children go to school down the street from the home. R.M. plays soccer. K.M. tried soccer but did not enjoy it. The family has taken trips with the children to visit extended family, go snowmobiling, and once visited the Great Smoky Mountains. K.M. gets along "very well" with the foster parents, feels safe with them, will go to them to have her needs met, and has improved her communication skills. She calls them "mom and dad." R.M. also has a very good relationship with them and alternates calling them either mom or dad or by their first names. "There are times that he needs a little bit more redirection. Usually he responds to it, depends on the day." The other children in the home are all boys, and K.M. and R.M. get along well with them. They are very busy, but they do activities with the children and show them how to use cell phones and watch YouTube. They have typical sibling relationships and interact with their pets. K.M. and R.M. have half-siblings on respondent's side, but no interaction with them.

¶ 37    The foster parents were willing to provide permanency for the children through adoption. Rutenber had no concerns about the safety and welfare of the children in the home. The children are young, but she had asked them general questions about where they might want to live forever and, lately, the response has been in the foster family's home. Rutenber testified that it was "absolutely" important that the children have permanency. "They've been in care far too long. We're going on six years, and they've been in care longer than they ever lived with their biological parents and they need a sense of a forever family." She was concerned that, if they remained in substitute care, they would not have a true sense of family and would always have the concern that

their placement could change.  Rutenber reiterated that she has been in social services for 27 years, and it was her opinion that the children need permanency and it was in their best interests to terminate respondent's parental rights.

¶ 38    On cross-examination, Rutenber agreed that respondent was not invited to counseling sessions concerning K.M. or to scheduled visits with R.M. after late 2020.  K.M. is on two medications, including Lexapro.  She agreed that R.M. was recently prescribed a medication and she had noticed a "dramatic" change in that he was able to follow directions more easily, was not quite as active, and he had reported that he felt better and could listen more in school.  According to Rutenber, there was not a discussion about medicating until recently because doctors are often reluctant to prescribe medication to children younger than five, but she had discussed it with the foster mother and the foster mother had asked the doctor about trying medication.  When asked to describe R.M.'s improvement, Ruteber explained,

> "He is, he is more easy to be redirected.  He follows directions where it's not a consistent, constant request all the time.  It may be two or three or four versus eight, nine, or ten.  He knows when he needs to go timeout, and he will comply with timeout.  He appreciates the positive feedback that foster parents, myself give him in regards to good choices.  He will sit and, well, first of all, sit; second, have a conversation with myself or the foster parents or the other children where he could, if you have the, the image of an Energizer bunny, he would be all over the place, all the time."

Rutenber continued to believe that respondent's difficulties redirecting R.M. and getting him to listen to commands reflected a parenting problem because he was not consistent with his expectations and would not place R.M. in a time-out when necessary, but when she or the case aide did so, R.M. would be able to listen.  She agreed that respondent was never allowed input into

whether R.M. should try medication. Rutenber agreed that, prior to medication, R.M. would act out, misbehave, and not follow directions for the foster parents, but she did not have concerns about their ability to discipline or redirect R.M., whereas respondent rarely disciplined him. Rutenber testified that the foster parents effectively use time-outs and, prior to medication, there were times that R.M. would strike out at her, the foster parents, or the other children in the home, but they did not react maliciously or hold it against him. Rather, they explained that it was not appropriate, that he needed to use his words, and then they moved on.

¶ 39    Respondent testified. He presented photographs that he took with the children at the discovery center, a park district facility, Chuck E. Cheese, and a restaurant play center during their early visits. In addition, he had a photograph of a "Kiwi" craft project kit that he brought to Children's Home & Aid. He testified that they reflected the "very loving family bond and relationship" that he had with his children and that he tried to engage them in various active and intellectual experiences. Respondent explained the challenge of trying to establish himself as a father in a one-hour period while the children are being raised by other people and while not overstepping the bounds set by the agency. He explained that, for the most part, the visits were good, but the kids would be kids and they, too, were adjusting to changed dynamics. As to R.M., he wished to see where his behavior was headed before necessarily stepping in, understanding and respecting that he was an active child in a controlled environment, having only one hour to work with him, and it was "very difficult." He wanted to maintain safety, but it was challenging that his role as a father was jeopardized when others intervened. Respondent felt that Rutenber and other aides were sometimes too quick to intervene. Respondent felt that his young children also behaved a bit differently in the active, more "Montessori"-type environments than they did in the controlled room, where he was balancing variables "in a limited hour without turning them against you to not

wanting to come back for another visit the next week." He reiterated that he had a limited time to establish "things" as compared to the environment they were mostly involved in (presumably with the foster parents). Both children call him "daddy."

¶ 40    The foster mother briefly stated that she and the foster father are happy to have R.M. and K.M., they have "gelled" with their family, and they love them very much.

¶ 41    On November 10, 2021, the court found that it was in the children's best interests to terminate respondent's parental rights. The court noted that both children have needs that are more challenging than other children might have. The foster parents have worked as a team since 2018 to address those needs. The children have integrated into the family and have developed familial bonds with them and with extended family. The court noted that it reexamined the evidence and took judicial notice of the evidence presented during the unfitness portion of the proceedings. It found "[t]he prospect of reunification within a reasonable period of time is not optimistic. The overriding concern of the juvenile court system in the Juvenile Court Act at this phase is permanency for the minors. And in this case, permanency is on the horizon because the foster family has indicated that they are available to provide, to provide permanency." Given the totality of evidence, the court found that the State met its burden by a preponderance of the evidence that it was in the children's best interests to terminate respondent's parental rights. Respondent appeals.

¶ 42                                II. ANALYSIS

¶ 43    Respondent argues on appeal that the trial court erred in determining that he is an unfit parent and that it is in the children's best interests for his parental rights to be terminated.

¶ 44    Proceedings to terminate parental rights are governed principally by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) (Act) and the Adoption Act (750 ILCS 50/1 *et*

*seq.* (West 2018)).  The Act provides a two-step process for the involuntary termination of parental rights.  *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010).  First, the State must prove that the parent is unfit by clear and convincing evidence.  *Id.*  Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) lists the grounds under which a parent can be found unfit.  *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004).  Second, if the court makes a finding of unfitness, the court then considers whether it is in the best interests of the minor to terminate parental rights.  *Deandre D.*, 405 Ill. App. 3d at 953.  The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interests.  *Id.*

¶ 45                                    A. Unfitness

¶ 46    We address first respondent's arguments concerning the court's finding of unfitness.  In his appellate brief, respondent commences his argument by addressing count II, failure to make reasonable efforts (750 ILCS 50/1(D)(m)(i) (West 2018)).  Respondent asserts that the evidence demonstrated that he consistently made reasonable efforts throughout the case, with brief interruptions due to his employment.  Respondent points out that he completed parenting classes in 2017.  Further, he regularly participated in counseling, which the caseworker conceded, and his current counselor, Lauman, testified to the progress she saw.  Further, Lauman had explained that her review of reports from his prior counselors also reflected the progress he made with them.  Respondent notes that Lauman's initial report reflected that he had incorporated techniques taught to him by prior therapists and "sincerely is looking for direction and help in doing what he needs to do to get his children back."  In addition, respondent notes that he completed domestic violence counseling.  He acknowledges that he was unsuccessfully discharged three times, including in August 2019, six months into the relevant periods, but notes that the course consists of three, nine-week sessions, and he always continued to reengage when dismissed.  Respondent urges that

efforts are not unreasonable simply because a service is not *completed* during the relevant period. Finally, respondent argues that the record reflects that he engaged in visitation, when possible, throughout the duration of this case. He notes that visitation initially involved attendance by both parents together, but when K.M. displayed regressive behavior, visitation with her was suspended for both parents. He contends that Susan was later allowed therapeutic visits with K.M., which were also unsuccessful and resulted in K.M. displaying disturbing behavior afterwards. He, however, was never allowed to engage in therapeutic visits, was only allowed to visit K.M. with Susan present, and despite the case being initiated due to Susan's conduct and K.M. reacting negatively to Susan and positively to him, he was never again allowed visitation with K.M. As to R.M., the record reflects that respondent consistently visited, engaged appropriately, and brought a duffel bag of toys with him for R.M. to play with at visits. In sum, respondent argues that there is no legitimate argument that his efforts were unreasonable and that the court's finding on count II was contrary to the manifest weight of the evidence.

¶ 47     As to count III, failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2018)), respondent argues that the best objective evidence of his progress came from Lauman, who testified that she reviewed reports from his prior counselors and spoke with them. According to Lauman, respondent incorporated techniques he was taught to cope with stress and anxiety, and he was gaining insight into his relationships and learning to make better choices. Respondent notes that, while a caseworker's report included the claim that his therapist "expressed a lack of progress and great concern for [respondent's] understanding of parenting specialized children and the way he regards [Susan]," no report from a therapist was attached to support that claim, nor was the counselor identified. Respondent asks that we consider the report's comments in light of the caseworker's apparent animosity toward him, as evidenced by her not engaging in a second

meeting with Lauman as requested, failure to allow him the opportunity to visit K.M. in a therapeutic setting ("the caseworker allows visits for the abusive parent, but denied them for the parent to whom K.M.'s responses were always positive"), and her unsupported references to his display of "male privilege" and "abusive behavior" in a laundromat. Respondent argues that encouraging honesty in a relationship and being punched for it does not reflect that *he* was abusive, nor "male privilege," which he deems to be a loaded political term. In sum, respondent contends that Rutenber's characterization of his alleged lack of progress in counseling should be viewed considering her animosity towards him. Moreover, he completed parenting classes in 2017, made progress in counseling, and made progress in domestic violence classes, ultimately completing them.

¶ 48    Finally, as to count I, failure to maintain a reasonable degree of interest, concern, or responsibility (750 ILCS 50/1(D)(b) (West 2018)), respondent notes that the State relied on the same evidence here as that presented for counts II and III and that the court ruled that the State had satisfied its burden on this count for the same reasons noted for counts II and III. Thus, respondent incorporates his prior arguments and adds that the evidence reflected he consistently showed reasonable interest, concern, and responsibility for the children's welfare over this four-year case. He completed the integrated assessment, signed all requested consents, engaged in parenting classes, counseling, and domestic violence classes, and regularly participated in visitation, bringing with him food, toys, and clothes. Respondent asserts that the complaints made by the caseworker about his alleged failure to properly discipline R.M. during visits may be the result of animosity, given that the foster parents experienced the same challenges, but were not hindered as he was by being confined to a visitation area in an office. He notes that R.M.'s behavior improved after he received prescription medication. Respondent also notes that, while Rutenber blamed him

for any altercations involving women, the orders of protection upon which she relied for that position were both dismissed (as the court noted). Respondent disputes Rutenber's contention that missing appointments with her evidenced he could not properly parent children who needed numerous medical and mental health appointments, noting that he kept "the most important appointments in this case," namely, those with R.M., his counselors, his parenting classes, and domestic violence classes over a four-year period. He concludes that, setting aside Rutenber's animosity, inexplicable refusal to allow him even therapeutic visits with K.M., and her unsupported claims of his asserting "male privilege" and abusive behavior, the record reflects that he consistently showed interest, concern, and responsibility for R.M. and K.M., "to the extent he was allowed to do so." For the following reasons, we reject respondent's arguments.

¶ 49    First and foremost, we wish to recognize that several of respondent's frustrations are understandable. For example, we understand why respondent would desire the opportunity to resume visitation with K.M., and, to the extent there was any implication that respondent's repeated questioning about that opportunity somehow reflected an insensitivity to K.M.'s struggles, it is not reasonable. Further, we understand why respondent would find fault with the State's repeated attempts to cast this case as coming into care because he was "unwilling" to keep his children out of care and left them alone with Susan. The evidence demonstrates that characterization is an oversimplification. As respondent explained, and as even the 2017 statement of facts demonstrated, the practicalities of respondent's employment were known *before* the weekend of Susan's arrest, which is partly why the children were *not* left alone with Susan and why the uncle was present with them. Perhaps his work situation rendered respondent *unable* to take the children full time, but characterizing him as not wanting the children was inaccurate, and the record reflects that, even in 2017, respondent communicated that he wished to be primary

caregiver but needed help. We also understand respondent's frustration over the challenges of visiting R.M. for one hour weekly in a confining room with supervision, intervention, and few activities to occupy a young child with hyperactivity. We recognize that the foster parents, in fact, had the benefit of more space, time, and, now, medication to assist them in working with and controlling R.M.'s behavior. In contrast, hoping to avoid spending his entire hour punishing R.M., respondent tried to see where the behavior was going before intervening, tried to engage R.M. with the two activities he was allowed to bring to the room, tried verbal redirection, and, if that did not work, physically moved R.M away from the unsafe condition. Occasionally, the aide needed to assist him in these tasks. Although the record suggests that respondent was not receptive to help and did not implement techniques that could have improved the visitation, we nevertheless understand why, given the comparative circumstances, respondent felt at a disadvantage. Finally, we understand why, when the evidence showed that *he* was punched and removed himself from the laundromat situation, respondent would object to assertions that he displayed "male privilege" (however the counselors or caseworkers define that term). In essence, while we must, for the following reasons, affirm the trial court, we nevertheless believe it important to recognize that some of respondent's frustrations resonate.

¶ 50    Turning to the standard of review which governs our resolution of this appeal, we may reverse a finding of unfitness only where it is against the manifest weight of the evidence, that is, where the determination is unreasonable. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). The grounds for finding unfitness under the Adoption Act are *independent*, and we affirm the trial court's judgment if the evidence supports any *one* of the grounds alleged. See 750 ILCS 50/1(D)(m) (West 2018); see also *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30. Thus, here, we need not address all three bases upon which the court found unfitness. Rather, we conclude

that the court's finding that respondent was unfit as alleged in count III, for failing to make reasonable progress toward the return of the children to him during the two nine-month periods alleged in the petition (which overlap) (750 ILCS 50/1(D)(m)(ii) (West 2018)), was not against the manifest weight of the evidence.

¶ 51    "[I]in determining whether a parent has made reasonable progress toward the return of the child, courts are to consider evidence occurring only during the relevant nine-month period ***." *In re J.L.*, 236 Ill. 2d 329, 341 (2010).  During the relevant periods here (March 12, 2019, to December 11, 2019, and April 28, 2019, to January 27, 2020), respondent was found to have not made reasonable progress at permanency review hearings on March 12, 2019, August 13, 2019, and January 27, 2020.  The service plans accompanying those periods support the findings of no reasonable progress.  Specifically, the April 1, 2019, service plan reflects that respondent's counseling goals included better time-management skills to manage stress and to "learn effective boundaries that will enable him to schedule his life in such a way as to prioritize his children and service plan requirements."  However, there remained continued issues scheduling appointments and contacting respondent, which was viewed as relevant to his ability to parent two special-needs children with numerous appointments.  The report marked respondent's progress as unsatisfactory in both individual and domestic violence counseling, noting that while he had reenrolled in domestic violence counseling, he would need to improve his attendance and, to progress, needed to share more about his personal beliefs and core values.  An August 13, 2019, report by Reddy noted that respondent's methods for handling anger and the issue of "needing to help everyone" had not yet been addressed.  The October 1, 2019, service plan reflected that respondent had again been discharged from domestic violence counseling.  The counselor reported a lack of progress and that he was not open and honest during sessions and was creating an alternate reality.  The

report reflected concern that not only did respondent not communicate about a pending order of protection (granted in June 2019, but vacated August 2019) or that he was identified as the father of two other small children, he did not appear to recognize the *relevance* of either to this case. Indeed, although the caseworker and her supervisor "explained profusely that this is critical information, [    ] [respondent] continues to fight this claim." The report expressed continued concern that respondent struggled to understand how to parent his children with their special needs.

¶ 52    Given the foregoing, we cannot find unreasonable the court's finding that there was no measurable or demonstrable movement toward reunification during the relevant periods. Reasonable progress is an objective standard that requires at a minimum, "measurable or demonstrable movement" toward reunification. *In re Daphnie E.*, 368 Ill. App. 3d 1053, 1067 (2006). Reasonable progress exists when the court is able to conclude that it can order the children returned home to the parents in the near future. See, *e.g.*, *In re A.S.*, 2014 IL App (3d) 140060, ¶ 17. We do not find persuasive respondent's attempt to minimize the report's statements on the basis that the counselor was not identified, as the record reflects that Reddy was his counselor for around 18 months, in 2019 through approximately August 2020, which respondent did not dispute and, further, his counselor questioned Rutenber using an August 13, 2019, report from Reddy. Thus, his suggestion that the counselor who made the statement is unknown is not convincing. In addition, we reject respondent's suggestion that we should view the report considering Rutenber's animosity toward him. Frankly, Rutenber was not, for example, the reason respondent was discharged for a third time from domestic violence counseling during the relevant periods; that event was an objective one, and respondent does not dispute it occurred. Finally, while respondent's progress with Lauman is laudable, it did not occur during the relevant periods. And while Lauman testified generally that she reviewed the reports from respondent's prior counselors

and noted his progress with them, it is not clear that the alleged progress occurred during the periods identified in the petition, nor that the progress was of a nature reflecting demonstrable movement toward reunification such that the court would soon be able to order the children home.

¶ 53    In sum, the court's finding of unfitness was not against the manifest weight of the evidence. As we may affirm the unfitness finding if the evidence supports any one of the grounds alleged (*B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30), the trial court did not err in finding respondent unfit.

¶ 54                                B. Best Interest

¶ 55    Next, we reject respondent's argument that the State failed to prove that it was in the children's best interests to terminate his parental rights. Respondent argues that the evidence demonstrated that he regularly visited with R.M. over the four-year period and that R.M. always calls respondent "daddy." R.M.'s prescription medication has helped him follow directions, and the caseworker has admitted that "there is a dramatic change." Accordingly, respondent essentially urges that his purported challenges disciplining or redirecting R.M. should not weigh against him in the best-interest analysis. He notes that he has not been allowed contact with K.M., and "the [S]tate simply cannot claim that it is in K.M.'s best interests to terminate [respondent's] parental rights to her when the [S]tate has wrongfully prevented any interaction between the two since 2019." He argues that the State stood between him and his children "without legal justification" and then wrongfully claimed that, because the children have now bonded with their foster parents, his rights should be terminated. Respondent argues that the evidence does not support such a claim and that the State failed to meet its burden. We disagree.

¶ 56    At the best-interests stage, the court "focuses upon the child's welfare and whether termination would improve the child's future financial, social[,] and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). "[A]t a best[-]interests hearing, the parent's interest in

maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The court must consider the following factors in making a best-interests determination: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and security; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). We will reverse a best-interests finding only where it is against the manifest weight of the evidence. See *N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 57    Here, while we again acknowledge respondent's frustrations concerning the circumstances under which he tried to manage R.M.'s behavior, the best-interests question concerns what is best for the children, not respondent's interests. The evidence demonstrates that the children have been assimilated into the foster family and have developed relationships with both their immediate and extended family members. The family meets their daily needs, as well as their many specialized needs. At times, they both refer to the foster parents as mom and dad, they feel safe in the home, and recently reported that they would like to live there forever. The foster mother told the court that she and the foster father loved the children very much, and, while the record reflects that respondent also loves his children, the court must consider the children's need for stability and permanence. The finding of neglect was made in October 2017, and the best-interests hearing was held in November 2021. The children have been with the foster family for half of that four-year period, and the family is willing to provide permanency through adoption.

¶ 58    In sum, when weighing the children's best interests, the trial court properly considered the relevant factors, including that of permanency, and the record supports its findings. Thus, we cannot conclude that the trial court erred in determining that termination of respondent's parental rights is in the children's best interests.

¶ 59                                III. CONCLUSION

¶ 60    For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 61    Affirmed.